UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RAMEISHA AMOUR WHITE            :
O/B/O ILW                      :
                               :
V.                             :   CIV. NO.  3:09CV1013(JCH)
                               :
MICHAEL J. ASTRUE,             :
COMMISSIONER OF SOCIAL         :
SECURITY                       :

RECOMMENDED RULING ON CROSS MOTIONS

I.   INTRODUCTION

Rameisha Amour White brings this action on behalf of ILW,

under Sections 205(G) and 1631(c)(3) of the Social Security Act,

42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a final

decision of the Commissioner of Social Security that ILW was not

entitled to Disability Insurance Benefits under Title XVI of the

Social Security Act.

For the reasons discussed below, plaintiff's Motion for an

Order Reversing the Decision of the Commissioner **[Doc. #13]** is

**denied in part and granted in part** and defendant's Motion to

Affirm the Decision of the Commissioner is **[Doc. #19]** is **DENIED**.

II.  ADMINISTRATIVE PROCEEDINGS

White applied for Supplemental Security Income (SSI)

disability benefits on behalf of her five year-old child, ILW, on

May 24, 2006, by filing an application with the Social Security

Administration. (Tr. 145-150).  It was subsequently amended on

November 1, 2006 (Tr. 151), and November 27, 2006 (Tr. 152-153).

1

The claim was denied initially and upon reconsideration.  (Tr.
142-144, 136-137).  A request for a hearing was filed on May 21,
2007.  (Tr. 132-134).  A hearing was conducted on May 13, 2008,
and the ALJ issued an unfavorable decision on May 28, 2008.  (Tr.
62-77).  On July 25, 2008, plaintiff appealed by filing a letter
requesting review of the hearing decision, and submitted
additional evidence in the form of treatment notes from Clifford
Beers Clinic, dated July 19, 2007 to July 17, 2008 (Tr. 370-398),
and a report by Douglas Nygren, LCSW.  (Tr. 366-369).  On April
17, 2009, the Appeals Council denied the plaintiff's request for
review.  On June 18, 2009, plaintiff submitted another letter to
the Appeals Council to ensure that the entire record had been
reviewed and to request re-opening and reconsideration of the
Appeals Council denial; the Appeals Council confirmed its denial
on July 20, 2009.  This case is now ripe for review under 42
U.S.C. § 405(g).

III. STANDARD OF REVIEW

     The scope of review of a social security disability
determination involves two levels of inquiry.  The court must
first decide whether the Commissioner applied the correct legal
principles in making the determination.  Next, the court must
decide whether the determination is supported by substantial
evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).
Substantial evidence is evidence that a reasonable mind would

accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998). The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact. Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodrigues v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977). The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner. Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993). The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings. In reviewing an ALJ's decision, the court considers the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). The court's responsibility is always to ensure that a claim has been fairly evaluated. Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1987) (quoting Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir.

1987)).  To enable a reviewing court to decide whether the
determination is supported by substantial evidence, the ALJ must
set forth the crucial factors in any determination with
sufficient specificity.  Ferraris v. Heckler, 728 F.2d 582, 587
(2d Cir. 1984).  Thus, although the ALJ is free to accept or
reject the testimony of any witness, a finding that the witness
is not credible must nevertheless be set forth with sufficient
specificity to permit intelligible review of the record.
Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir.
1988).  Moreover, when a finding is potentially dispositive on
the issue of disability, there must be enough discussion to
enable a reviewing court to determine whether substantial
evidence exists to support that finding.  Peoples v. Shalala,
1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris,
728 F.2d at 587.

IV.  ELIGIBILITY FOR BENEFITS

An individual under the age of eighteen is disabled, and
thus eligible for SSI benefits, if he or she has a medically
determinable physical or mental impairment, which results in
marked and severe functional limitations, and which can be
expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12
months.  42 U.S.C. § 1382c(a)(3)(C)(i).  However, that
definitional provision excludes from coverage any "individual

under the age of [eighteen] who engages in substantial gainful activity...."  42 U.S.C. § 1382c(a)(3)(C)(ii); <u>Martinbeault v. Astrue</u>, WL 5030789, 2-4  (N.D.N.Y. 2009).

By regulation, the agency has prescribed a three-step evaluative process to be employed in determining whether a child can meet the statutory definition of disability.  20 C.F.R. § 416.924;  <u>Kittles v. Barnhart</u>, 245 F. Supp. 2d 479, 487-88 (E.D.N.Y. 2003).

The first step of the test, which bears some similarity to the familiar five-step analysis employed in adult disability cases, requires a determination of whether the child has engaged in substantial gainful activity.  20 C.F.R. § 416.924(b); <u>Kittles</u>, 245 F. Supp. 2d at 488.  If so, then both statutorily and by regulation the child is ineligible for SSI benefits.  42 U.S.C. § 1382c(a)(3)(C)(ii); 20 C.F.R. § 416.924(b).

If the claimant has not engaged in substantial gainful activity, the second step of the test next requires examination of whether the child suffers from one or more medically determinable impairments that, either singly or in combination, are properly regarded as severe, in that they cause more than a minimal functional limitation.  20 C.F.R. § 416.924(c); <u>Kittles</u>, 245 F. Supp. 2d at 488.

If the existence of a severe impairment is discerned, the agency must then determine, at the third step, whether it meets

or equals a presumptively disabling condition identified in the listing of impairments set forth under 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Listings"). Id. Equivalence to a listing can be either medical or functional. 20 C.F.R. § 416.924(d); Kittles, 245 F.Supp.2d at 488. If an impairment is found to meet, or qualify as medically or functionally equivalent to, a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

Analysis of functionality is informed by consideration of how a claimant functions in six main areas referred to as "domains." 20 C.F.R. § 416.926a(b)(1). The domains are described as "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). Those domains include: (i) acquiring and using information; (ii) attending and completing tasks; (iii) interacting and relating with others; (iv) moving about and manipulating objects; (v) caring for oneself; and (vi) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).

Functional equivalence is established in the event of a finding of an "extreme" limitation, meaning "more than marked," in a single domain. 20 C.F.R. § 416.926a(a). An "extreme limitation" is an impairment which "interferes very seriously with [the claimant's] ability to independently initiate, sustain,

or complete activities." 20 C.F.R. § 416.926a(e)(3)(I).

Alternatively, a finding of disability is warranted if a "marked" limitation is found in any two of the listed domains. 20 C.F.R. § 416.926a(a). A "marked limitation" exists when the impairment "interferes seriously with [the claimant's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with the ability to function (based upon age-appropriate expectations) independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.00(c). A "marked" limitation is "'more than moderate' but 'less than extreme.'" 20 C.F.R. § 416.926a(e)(2)(i). The Commissioner finds a "marked" limitation when the child has a valid score that is two standard deviations or more below the mean (but less than three standard deviations) on a comprehensive standardized test designed to measure ability or functioning in that domain, and the child's day-to-day functioning in domain-related activities is consistent with that score. 20 C.F.R. § 416.926a(e)(2)(iii).

V. SUBSTANTIAL EVIDENCE

1. Neurofibromatosis

Medical records from ILW's primary care provider, Yale-New

Haven Hospital, dated June 6, 2001 through March 2007, indicate that she was diagnosed shortly after birth with neurofibromatosis, type 1.[1] (Tr. at 7.)  There are no indications in the treatment records of any severe physical complications from the disease.  Id.

Her most recently reported routine follow-up genetics evaluation was in April 2008.  (Tr. 362-364).  Pediatric nurse practitioner Alana L. Clements and Dr. Maurice J. Mahoney noted that ILW had a difficult year in terms of her behavior, but otherwise was doing well.  (Tr. 362).  Plaintiff reported increased freckling and café-au-lait spots in the last year, but no neurofibromas.  (Tr. 363).  On exam, Ms. Clements and Dr. Mahoney noted that ILW mostly was cooperative, though it was difficult for her to stay still.  (Tr. 363).  Her development was appropriate for her age.  Id.  Ms. Clements and Dr. Mahoney emphasized that ILW needed a formal ophthalmologist evaluation. (Tr. 363-364).

    2.  Dr. Campagna

In December 2006, ILW underwent a consultive examination with psychologist Dr. Anthony Campagna.  (Tr. 310-313).  Dr.

----

[1]Neurofibromatosis type 1 is a disorder of the autosomal dominant inheritance, marked by developmental changes in the nervous system, muscles, bones, and skin with café-au-lait spots, freckling, Lisch nodules (nodules in the eye), and multiple pedunculated neurofibromas (benign tumors) over much of the body. See Dorland's Illustrated Medical Dictionary 1284 (31st ed. 2007).

Campagna reported that ILW demonstrated significant communicate reticence and he had trouble interviewing her. (Tr. 310). Plaintiff completed the Connor's Parent Rating Scale - Revised, yielding a score of 60 on the oppositional behavior scale, which Dr. Campagna noted falls in the borderline range. (Tr. 311). Dr. Campagna indicated that plaintiff's scores confirmed the impression that ILW has an underlying impairment in executive functioning. (Tr. 311).

Dr. Campagna noted that ILW was highly restless and could not remain in her chair for more than 30 seconds at a time, even when engaged in highly-interesting tasks. (Tr. 312). ILW showed good comprehension, but her attention was so poor that she often missed instructions. Id. She responded well to positive feedback and was resilient to failure. Id. Her speech was articulated poorly, with Dr. Campagna unable to understand her utterances more than fifty percent of the time. Id. Grammar, vocabulary, and syntax were significantly below average, but ILW's thinking was developmentally appropriate and she demonstrated adequately imaginative, logical, and goal-directed thought. Id.

Upon intellectual evaluation, Dr. Campagna was able to completely administer one test,[2] the Sequential Processing Global

---

[2] Dr. Campagna's report notes that the battery of tests was altered due to fact that the client arrived quite late for the appointment and the client's clinical condition.

Scale, but reported that the results underestimated ILW's best level of functioning, due to her poor concentration and attention. (Tr. 312). He found that his limited intellectual assessment supported a guarded impression of underlying intelligence in the average range. Id. Dr. Campagna noted similar problems with neurological screening, though he indicated that ILW's score on the Beery-Buktenica Developmental Test of Visual-Motor Integration was 1.5 standard deviations below the mean for her age group. Id. He stated that this result supported concern that ILW's behavioral difficulties reflected diffuse underlying neurological impairment. Id.

Upon personality evaluation, Dr. Campagna noted that ILW's responses on Rorschach Inkblot Technique suggested a good age-appropriate imagination and access to developmentally normative ways of experiencing the world. (Tr. 312-313). Dr. Campagna concluded that ILW's test findings as a whole supported an impression of significant organic mental disorder manifest in impairments in central visual processing and executive functioning. (Tr. 313). Her organic difficulties were seen as interfering with ILW's ability to maximize intellectual potential, as evidenced by a score on the Wechsler scale one standard deviation below average. Id. Dr. Campagna stated that ILW's condition was manifest in marked inattention, marked impulsiveness, and marked hyperactivity, as well as marked

impairment in age-appropriate communication and cognitive functioning, and age-appropriate social and interpersonal functioning, age-appropriate personal functioning, and age-appropriate concentration and persistence on developmentally-appropriate tasks. Id.

### 3. Clifford Beers Clinic - Irja Peck, Douglas Nygren & Joan Kearney

In December 2006, Irja Peck, a masters in social work intern, and Douglas C. Nygren, a licensed clinical social worker, wrote in a letter to plaintiff that ILW was being treated at Clifford Beers Clinic with a diagnosis of ADHD combined type. (Tr. 314). ILW's Global Assessment of Functioning Score (GAF) was 50, which indicates serious symptoms or any serious impairment in social or school functioning. Id.; see American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. 2000)(DSM-IV).

In January 2007, Ms. Peck and Mr. Nygren filled out a questionnaire regarding ILW's ADHD. (Tr. 340-346). The questionnaire was also signed in February 2007 by advanced practice registered nurse Joan Kearney. (Tr. 346). Ms. Peck and Mr. Nygren reported that ILW's ADHD began when she started school, and she currently had a GAF score of 55, which indicates moderate symptoms or moderate difficulty in social or school functioning. See DSM-IV. Plaintiff had reported she was no longer receiving phone calls from ILW's school. (Tr. 341). ILW

11

appeared to have age-appropriate speech, was able to express coherently her wants and needs, and was able to respond appropriately and relevantly when spoken to. (Tr. 341). Her play was chaotic, her movements were quick, and she needed frequent prompts to put toys away and stop interrupting. (Tr. 343). She was constantly active. Id. Ms. Peck and Mr. Nygren stated that ILW's problems maintaining attention could negatively impact her relationships with peers and her ability to stay on task at school. Id. In March 2007, Ms. Peck and Ms. Kearney wrote a letter reiterating the information provided in the January 2007 questionnaire, though they stated that ILW's current GAF score was 51. (Tr. 325-327). In April 2007, Ms. Peck and Mr. Nygren wrote a letter indicating that ILW's diagnosis and prognosis had not changed since January, though now she was taking Concerta. (Tr. 339).

In March 2008, Ms. Kearney wrote a letter to plaintiff's non-attorney representative stating that she was concerned about ILW's level of functioning and was considering a diagnosis of Bipolar Disorder-Early Onset. (Tr. 358). Ms. Kearney noted that she had increased ILW's dosages of Concerta and Risperdal. (Tr. 358). In May 2008, Ms. Kearney wrote another letter to plaintiff's non-attorney representative, stating that ILW had been extremely active and abrasive with little impulse control. (Tr. 359). ILW's affect was unstable and she showed very poor

12

social judgment.  Id.  Ms. Kearney indicated that ILW had to be monitored at all times to prevent her from engaging in dangerous behaviors, and further noted that ILW could be verbally hostile and aggressive.  Id.  Ms. Kearney had diagnosed ILW with Mood Disorder, Not Otherwise Specified.  Id.

In February 2008, Mr. Nygren from Clifford Beers Clinic completed a Children's SSI Functional Assessment Form.  (Tr. 353-357).  He opined that ILW had marked inattention, marked impulsiveness and marked hyperactivity.  (Tr. 353).  He further opined that ILW had extreme impairment in cognitive/communicative function, marked impairment in age-appropriate social functioning, impairments in age-appropriate personal functioning, and marked impairments in maintaining concentration, persistence, or pace.  (Tr. 353-354).  With respect to functional equivalence, Mr. Nygren opined that ILW had marked limitations in acquiring and using information, marked limitations in interacting and relating to others, extreme limitations in moving about and manipulating objects, marked limitations in caring for herself, and no limitations in health or well-being.  (Tr. 355-356).  Mr. Nygren stated that ILW is hyperactive, intrusive, aggressive, and belligerent, and that her medication trials were only somewhat effective.  (Tr. 357).

In July 2008, following the ALJ's decision, Mr. Nygren at the Clifford Beers Clinic wrote a letter to plaintiff's non-

attorney representative to further explain his February 2008
opinion. (Tr. 366-369). Mr. Nygren stated that ILW recently had
been referred to the Hospital of St. Raphael's Children's Day
Hospital for more intensive treatment and diagnostic work-up.
(Tr. 366). He explained that, although ILW's providers at
Clifford Beers clinic initially had diagnosed ADHD, ILW's failure
to respond significantly to medication led her providers to
suspect, and ultimately diagnose, a mood disorder. (Tr. 367).
Mr. Nygren further stated that although ILW was doing well in
school academically, she was not doing well socially. Id. He
concluded that in his past twenty years of practice, ILW was one
of the most impaired children he had seen. (Tr. 368).

    4. <u>School Opinions</u>

In September 2006, ILW's preschool teacher at Dwight Head
Start, Carolyn Kennedy, completed a Teacher Questionnaire. (Tr.
300-309). Ms. Kennedy indicated that ILW had some problems in
the domain of acquiring and using information, including obvious
problems in reading and comprehending written material,
understanding and participating in class discussions, recalling
and applying previously learned material, and applying problem-
solving skills in class discussions, as well as a serious problem
in comprehending and doing math problems. (Tr. 310). Ms.
Kennedy indicated that ILW had some problems in the domain of
attending and completing tasks, including obvious problems in

organizing her things, completing work accurately, and working without distracting herself or others, as well as serious problems in focusing to finish assigned activities, refocusing on tasks, completing assignments, and working at a reasonable pace. (Tr. 302).

Ms. Kennedy also found that ILW had some problems in the domain of interacting and relating with others, including obvious problems in using appropriate language and interpreting the meaning of facial expression, body language, hints, and sarcasm; a serious problem taking turns in conversations; and a very serious problem in introducing and maintaining relevant and appropriate topics of conversation. (Tr. 304). Ms. Kennedy indicated that she had to discipline ILW by putting her in timeout, and that she could understand almost all of ILW's speech. (Tr. 304-305). Ms. Kennedy opined that ILW had no problems in the domain of moving about and manipulating objects. (Tr. 305). Finally, Ms. Kennedy indicated that she did not have sufficient information to opine on ILW's medical conditions. (Tr. 308).

ILW received a report card from Amistad Academy Elementary School in April 2008. (Tr. 209-214). The report card indicated that ILW was proficient in most areas, including all reading comprehension skills, most music and physical education skills, all science skills, all social studies skills, all writing

skills, and most math skills. (Tr. 208-214). ILW was below proficient in a few areas, including following directions the first time they are given, completing homework thoroughly and neatly, speaking at appropriate times, following all school rules, coming to school every day on time, treating teachers and classmates with respect, and a few math skills. (Tr. 210-213). She needed improvement in telling the truth at all times. (Tr. 210).

In an undated letter, ILW's teachers, Amanda Alonzy and Amy Gunderson, wrote a letter To Whom it May Concern, describing ILW's behavior in school. (Tr. 360-361). They stated that ILW starts the day positive and helpful, but tends to be uncooperative after she is corrected by a student or an adult. (Tr. 360). If she is redirected for talking when the teacher is talking, she will throw herself on the floor, grunt, and have a verbal outburst. Id. Ms. Alonzy and Ms. Gunderson stated that ILW sometimes completes her tasks with little effort, but other times struggles to complete minor tasks and follow simple directions. Id. After being asked to move away from the rest of the students for misbehavior, she rolls her eyes and talks back to the teacher. Id.

Ms. Alonzy and Ms. Gunderson further stated that ILW struggles to remain in her seat, and travels around the classroom interrupting other students. Id. According to Ms. Alonzy and

Ms. Gunderson, ILW appears to have trouble making and maintaining relationships with other students. Id. On several occasions, she had taken things from other students and was unwilling to give them back. (Tr. 360-361). ILW also had been caught lying several times. (Tr. 361).

     5.  <u>State Agency Physicians</u>

In December 2006 and March 2007, state agency physician Dr. Virginia H. Rittner and psychologist Dr. Kirk Johnson reviewed the evidence in the record and completed a Childhood Disability Evaluation Form. (Tr. 317-323). They opined that ILW's impairments did not meet, medically equal, or functionally equal any listing. (Tr. 318). Specifically, Dr. Rittner and Dr. Johnson opined that ILW had less than marked limitations in the domain of acquiring and using information, marked limitations in the domain of attending and completing tasks, less than marked limitations in the domain of interacting and relating with others, no limitations in the domain of moving about and manipulating objects, less than marked limitations in the domain of caring for yourself, and no limitations in the domain of health and physical well-being. (Tr. 320-321).

In May 2007, state agency physician Dr. Carol R. Honeychurch and psychologist Dr. Robert Sutton, reviewed the evidence in the record and completed a Childhood Disability Evaluation Form. (Tr. 347-352). They stated that they agreed with Drs. Rittner

and Johnson.

6. <u>Testimony</u>

Plaintiff testified in May 2008 that ILW is hyper and does not listen.  When she goes to a store she is all over the place.  She does not have a babysitter because no babysitter can tolerate her behavior.  She is aggressive and wants to boss other children.  She picks up the baby at times when she is not supposed to, so she has to be watched all the time.  Plaintiff stated she has only been called to school because of problems once or twice in the past year.  ILW feeds, dresses and washes herself with supervision.  There has not been any counseling at school.  Her grades are satisfactory and there has been some improvement since November 2007, when she started taking medication.  ILW often does not tell the truth.  She volunteers to help with chores, but does not provide much real help.  After school, ILW does homework and watches television, but does not really pay attention to the television.  She puts things in her mouth that are not edible.  ILW engages in behavior that is not safe.  She broke her hand by jumping on the bed.  She climbs onto cabinets, wakes up in the middle of the night and wanders off a lot.

ILW testified that she is seven years old and attends Amistad Elementary School.  She has two younger sisters and one younger brother.  She does "a little bit good" in school.  She

eats lunch at school.  At home she helps care for her siblings and at times picks out her own clothes.  She has a bicycle, but is unable to ride it.  She likes to eat chicken with broccoli and noodles.  She gets along with her siblings except for one of her sisters, who hits her a lot.  She does not go to doctors much and does not take medications.  She goes to the nurse's office in school if she bumps into something or gets a stomach ache.  She stays out of school occasionally when she does not feel well.  Her mother takes her to school.

VI.  ALJ's Ruling

To meet the requirements of section 112.04, the claimant would have to have a mood disorder, characterized by elevated, expansive, or irritable mood, and at least three of a number of listed symptoms; or a bipolar or cyclothymic disorder manifested by the full symptomatic picture of both manic and depressive symptoms and the mood disorder would have to result in at least two of the following:

- Marked impairment in age-appropriate cognitive/communicative functioning;

- Marked impairment in age-appropriate social functioning;

- Marked impairment in age-appropriate personal functioning; or

- Marked difficulties in maintaining concentration, persistence, or pace.

The ALJ determined that ILW's impairments did not meet
Listing 112.04 (Mood Disorders) because the medical evidence
failed to show that her impairments caused limitations in at
least two areas of functioning to a marked degree. (Tr. 66).
The ALJ found that ILW may have a marked impairment in age-
appropriate social functioning, but does not have any of the
other limitations to a marked degree. The ALJ found that ILW did
not exhibit a depressive disorder, although her behavior on
occasion resembles that of a person with manic disorder. The ALJ
also found that ILW's neurofibromatosis is not accompanied by
medical findings that meet the requirements of any listed
impairment and that even the combination of ILW's impairments is
not medically equal to a listed impairment.

After considering the evidence of record, the ALJ found that
the claimant's medically determinable impairments could
reasonably be expected to produce the alleged symptoms; however,
the statements concerning the intensity, persistence and limiting
effects of the claimant's symptoms were not credible to the
extent that they were inconsistent with finding that the claimant
does not have an impairment or combination of impairments that
functionally equal the listings.

The ALJ analyzed ILW's function in six domains: (1)
acquiring and using information; (2) attending and completing
tasks; (3) interacting and relating to others; (4) moving about

and manipulating objects; (5) caring for oneself; and (6) health and physical well being. "To meet the requirements of Section 112.11, the claimant's condition would have to include medically documented findings of marked inattention, marked impulsiveness, and marked hyperactivity." 20 C.F.R. § 416.962a(d). The ALJ determined that ILW's impairments did not meet Listing 112.11 (ADHD) because the medical evidence failed to show that her impairments caused inattention, impulsiveness, and hyperactivity to a marked degree.

In determining the degree of limitation in each of the six functional domains, the ALJ considered all symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 416.929, SSR's 96-4p and 96-7p. The ALJ also considered the opinion evidence in accordance with 20 C.F.R. § 416.927 and SSRs 96-2, 96-5, 96-6p and 06-3p.

The Six Domains

A. Acquiring and Using Information

This domain considers how well a child is able to acquire or learn information, and how well a child uses the information she has learned. 20 C.F.R. § 416.926a(g). The regulations provide that a preschooler (i.e., a child age 3 to 6) without an impairment should begin to learn and use the skills that will

help her to read and write and do arithmetic when she is older.
(Tr. 71). All of these are called "readiness skills," and the
child should have them by the time she begins first grade. 20
C.F.R. § 416.926a(g)(2)(iii). The regulations provide that a
school-age child (i.e., a child age 6 to 12) without an
impairment should be able to learn to read, write, do math, and
discuss history and science.

Social Security regulation 20 C.F.R. § 416.926a(g)(3) sets
forth some examples of limited functioning in this domain that
children of different ages might have. The examples do not apply
to a child of a particular age; rather, they cover a range of
ages and developmental periods. In addition, the examples do not
necessarily describe "marked" or "extreme" limitation in the
domain. Some examples of difficulty children could have in
acquiring and using information are: (i) does not understand
words about space, size or time; (ii) cannot rhyme words or the
sounds of words; (iii) has difficulty recalling important things
learned in school yesterday; (iv) has difficulty solving
mathematics questions or computing arithmetic answers; or (v)
talks only in short, simple sentences, and has difficulty
explaining what she means.

The ALJ found that ILW has less than marked limitation in
acquiring and using information. The ALJ noted that, although
ILW obviously needs more structure and support than average, she

does well academically at school and was even described as reading above grade level. The ALJ found that ILW has the ability to learn and her ability to focus for the long term on one task seems to be the primary concern in this domain. The Court finds that substantial evidence supports the ALJ's finding.

B. <u>Attending and Completing Tasks</u>

This domain considers how well a child is able to focus and maintain attention, and how well she is able to begin, carry through, and finish activities, including the pace at which she performs activities and the ease of changing activities. 20 C.F.R. § 416.926a(h).

The regulations provide that a preschooler without an impairment should be able to pay attention when she is spoken to directly, sustain attention to her play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. The child should also be able to focus long enough to do many more things independently, such as gathering clothes and dressing, feeding or putting away toys. The child should usually be able to wait her turn and to change her activity when a caregiver or teacher says it is time to do something else. 20 C.F.R. § 416.926a(g)(2)(iii).

The regulations provide that a school-age child without an impairment should be able to focus her attention in a variety of situations in order to follow directions, remember and organize

school materials, and complete classroom and homework assignments. The child should be able to concentrate on details and not make careless mistakes in her work (beyond what would be expected in other children of the same age who do not have impairments). The child should be able to change activities or routines without distraction, and stay on task and in place when appropriate. The child should be able to sustain attention well enough to participate in group sports, read by herself, and complete family chores. The child should also be able to complete a transition task (e.g. be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation. 20 C.F.R. § 416.926a(h)(2)(iv).

The regulation sets forth some examples of limited functioning in this domain that children of different ages might have. 20 C.F.R. § 416.926a(h)(3). Some examples of difficulty children could have in attending and completing tasks are: (i) is easily startled, distracted or over-reactive to sounds, sights, movements, or touch; (ii) is slow to focus on, or fails to complete, activities of interest; (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) is easily frustrated and gives up on tasks, including those she is capable of completing; or (v) requires extra supervision to remain engaged in an activity.

The ALJ found that ILW has less than marked limitation in

attending and completing tasks.  The Court finds the ALJ's finding is not supported by substantial evidence.  Rather, the Court finds far more evidence of a limitation in this domain than the ALJ acknowledges.

For example, in 2006, ILW's preschool teacher, Ms. Kennedy, indicated that ILW had obvious problems in organizing her things, completing work accurately, and working without distracting herself or others.  Ms. Kennedy also found problems in focusing to finish assigned activities, refocusing on tasks, completing assignments and working at a reasonable pace.  And in December 2006 and March 2007, Dr. Virgina H. Rittner and  Dr. Kirk Johnson reviewed the evidence in the record and found that ILW had marked limitations in the domain of attending and completing tasks.  In May 2007, Dr. Carol R. Honeychurch and Dr. Robert Sutton reviewed the evidence in the record and agreed with Drs. Rittner and Johnson.

It is with regard to this domain that the ALJ's failure to develop the record can perhaps best be seen.  Insufficient consideration was given to the opinions of the state agency physicians and psychiatrists.  State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs; the rules in 20 CFR §§ 404.1527(f) and 416.927(f) require administrative law judges and the Appeals Council to

consider their findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists.  SSR 96-6p.  Administrative law judges and the Appeals Council are not bound by findings made by state agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.  Id. The ALJ does not state her reasons for rejecting or discrediting the opinions of the state agency physicians and psychiatrists who reviewed the record in December 2006, March 2007 or May 2007, all of whom found a marked limitation in this domain.  In fact, the ALJ uses the state agency opinions in her ruling to discredit Dr. Campagna's opinions, since they found that his findings were inconsistent with the school records.

The ALJ also seems to rely on Ms. Kennedy's findings in her Teacher Questionnaire in finding a marked limitation in the domain of interacting and relating to others.[3]

The ALJ failed to develop the record by not explaining the

---

[3] In the domain of Interacting and Relating to Others, Ms. Kennedy's Teacher Questionnaire indicates that ILW has a very serious problem with introducing and maintaining relevant and appropriate topics of conversation (rating of 5 out of 5) and a serious problem taking turns in conversation (rating 4 out of 5). In the domain of Attending and Completing Tasks, Ms. Kennedy's Teacher Questionnaire indicates that ILW has a serious problem focusing long enough to finish assigned activity, refocusing to task when necessary, completing homework assignments and working at reasonable pace/finishing on time (rating all 4 out of 5). (Tr. 302-309).

weight given to the opinions of the state agency physicians and psychologists. Accordingly, the Court does not find that substantial evidence exists to support the ALJ's finding of a less than marked limitation. The Court does not make a finding of a marked limitation but directs plaintiff to supplement the record with current medical reports upon remand.[4] As the plaintiff points out, "[t]his case has been pending for four years - four years in the life of a child is huge . . ." (Pl's Suppl' Memo. in Opp. to Def's M. for Order Affirming at 1). The Court agrees that a child's development is rapid and ILW's condition may have worsened or improved since Ms. Kennedy's opinion in 2001, and the state agency psychiatrists' and physicians' opinions in 2006 and 2007. On remand, the ALJ is directed to review any new evidence submitted and discuss the weight to be given to the opinions of the state agency physicians and psychologists in accordance with SSR 96-6p.

C. <u>Interacting and Relating with Others</u>

This domain considers how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the

_____

[4] On July 25, 2008, plaintiff submitted treatment notes from July 19, 2007 - July 17, 2008. Notwithstanding another letter to the Appeals Council on July 18, 2009, plaintiff never submitted updated treatment notes or medical records.

possessions of others.  20 C.F.R. § 416.926a(I).

The regulations provide that a preschooler without an impairment should be able to socialize with children as well as adults.  The child should begin to prefer playmates and start developing friendships with children who are her own age.  The child should be able to use words instead of actions to express herself, and also be better able to share, show affection and offer help.  The child should be able to relate to caregivers with increasing independence, choose her own friends, and play cooperatively with other children, one at a time or in a group, without continual adult supervision.  The child should be able to initiate and participate in conversations using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what she says most of the time.  20 C.F.R. § 416.926a(i)(2)(iii).

The regulations provide that a school-age child without an impairment should be developing more lasting friendships with children who are of the same age.  The child should begin to understand how to work in groups to create projects and solve problems.  The child should have an increasing ability to understand another's point of view and to tolerate differences. The child should be well able to talk to people of all ages, to share ideas, tell stories and to speak in a manner that both familiar and unfamiliar listeners readily understand.  20 C.F.R.

§ 416.926a(i)(2)(iv).

Social Security regulation 20 C.F.R. § 416.926a(i)(3) sets forth some examples of limited functioning in this domain that children of different ages might have.  The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods.  Some examples of difficulty that children could have in interacting and relating with others are: (i) does not reach out to be picked up and held by caregiver; (ii) has no close friends, or all friends are older or younger than child; (III) avoids or withdraws from people she knows, or is overly anxious or fearful of meeting new people; (iv) has difficulty playing games or sports with rules; (v) has difficulty communicating with others; or (vi) has difficulty speaking intelligibly or with adequate fluency.

The ALJ found that ILW had a marked limitation in interacting and relating with others.  The ALJ noted that this is the area in which ILW's ADHD seems to present the most problems.  ILW has a tendency not to listen and to interrupt others.  The school records indicate that her behavior can be aggressive toward teachers and other students, that she takes things and is reluctant to give them back.  ILW has also been caught lying and appears not to care.  The Court finds substantial evidence exists to support the ALJ's finding of a marked limitation in this domain.

D.  Moving About and Manipulating Objects

This domain considers how well a child is able to move her body from one place to another and how a child moves and manipulates objects.  These are called gross and fine motor skills.  20 C.F.R. § 416.926a(j).

The regulations provide that a preschooler without an impairment should be able to walk and run with ease.  The child's gross motor skills should let her climb stairs and playground equipment with little supervision and let her play more independently.  The child's increasing strength and coordination should expand her ability to enjoy a variety of physical activities, such as running and jumping, throwing, kicking, catching, and hitting balls in informal play or organized sports. The child's fine motor skills should also be developing.  The child should be able to complete puzzles easily, string beads, and build with an assortment of blocks.

Social Security regulation 20 C.F.R. § 416.926a(j)(3) sets forth some examples of limited functioning in this domain that children of different ages might have.  Some examples of difficulty children could have in moving about and manipulating objects are: (i) difficulty with motor activities because of muscle weakness, joint stiffness or sensory loss; (ii) difficulty with balance or climbing up and down stairs; (iii) difficulty coordinating gross motor movements; (iv) difficulty with

sequencing hand or finger movements; (v) difficulty with fine
motor movements; or (vi) poor eye-hand coordination when using a
pencil or scissors.

The ALJ found that ILW had no limitation in moving about and
manipulating objects.  The Court agrees and finds that there is
substantial evidence to support the ALJ's finding.  The only
evidence in the record to support an impairment is Dr. Nygren's
report where he checked the box marked "no" indicating that ILW
is not able to move about and manipulate objects in an age-
appropriate manner.  Dr. Nygren's note indicates that, "[s]he
acts without thinking.  She has a thought [and] acts on it
without thinking whether the thought was a good idea.  This leads
her to do things she can't do.  She tries to pick up things
bigger than she is."  These are not examples of a child who has
any degree of limitation in moving about and manipulating
objects.  Accordingly, the Court finds substantial evidence
exists in the record to support the ALJ's finding.

E.  <u>Caring for Onself</u>

This domain considers how well a child maintains a healthy
emotional and physical state, including how well a child
satisfies her physical and emotional wants and needs in
appropriate ways.  This includes how the child copes with stress
and changes in the environment and whether the child takes care
of her own health, possessions, and living area.  20 C.F.R. §

416.926a(k).

The regulations provide that a preschooler without an impairment should want to take care of many of her own physical needs (e.g., putting on shoes, getting a snack), and also want to try doing things that she cannot do fully (e.g., tying shoes, climbing on a chair to reach something up high, taking a bath). Early in this age range, it may be easy for the child to agree to do what her caregiver asks. Later, that may be difficult for the child because she wants to do things her way or not at all. These changes usually mean that the child is more confident about her ideas and what she is able to do. The child should also begin to understand how to control behaviors that are not good for herself (e.g., crossing the street without an adult). 20 C.F.R. § 416.926a(k)(2)(iii).

The regulations provide that a school-age child without an impairment should be independent in most day to day activities (e.g., dressing and bathing), although she may still need to be reminded sometimes to do these routinely. The child should begin to recognize that she is competent in doing some activities but has difficulty doing others. The child should be able to identify those circumstances when she feels good about herself and when she feels bad. The child should begin to develop an understanding of what is right and wrong, and what is acceptable and unacceptable behavior. The child should also begin to

demonstrate consistent control over her behavior, and be able to avoid behaviors that are unsafe or otherwise not good for her. At this age, the child should begin imitating more of the behavior of adults she knows.  20 C.F.R. § 416.926a(k)(2)(iv).

Social Security regulation 20 C.F.R. § 416.926a(k)(3) sets forth some examples of limited functioning in this domain that children of different ages might have.  Some examples of difficulty children could have in caring for themselves are: (i) continues to place non-nutritive or inedible objects in the mouth; (ii) often uses self-soothing activities that are developmentally regressive; (iii) does not dress or bath age-appropriately; (iv) engages in self-injurious behavior; (v) does not spontaneously pursue enjoyable activities or interests; or (vi) has disturbances in eating or sleeping patterns.

The ALJ found that ILW has less than marked limitation in the ability to care for herself.  The Court finds substantial evidence in the record to support the ALJ's finding.

F.  <u>Health and Physical Well-Being</u>

This domain considers the cumulative physical effects of physical and mental impairments and any associated treatments or therapies on a child's functioning that were not considered in the evaluation of the child's ability to move about and manipulate objects.  20 C.F.R. § 416.929a(1).

Social Security regulation 20 C.F.R. § 416.926a(1)(3) sets

forth some examples of limited functioning in this domain that children of any age might have. Some examples of difficulty children could have involving their health and physical well-being are: (i) generalized symptoms, such as weakness, dizziness, agitation, lethargy, or psychomotor retardation because of any impairment(s); (ii) somatic complaints related to an impairment; (iii) limitations in physical functioning because of treatment; (iv) exacerbations from an impairment that interfere with physical functioning; or (v) medical fragility requiring intensive medical care to maintain level of health and physical well-being.

The ALJ found that ILW has less then marked limitation in health and physical well-being. The Court finds substantial evidence to support the ALJ's finding. ILW has neurofibromatosis that puts her at risk for developing health problems, but she has not thus far developed any physical complications.

VII. <u>ALJ's Credibility Assessment</u>

The function of the Commissioner includes evaluating the credibility of all witnesses, including the claimant. <u>See Carroll v. Secretary of HHS</u>, 705 F.2d 638, 642 (2d Cir. 1983). Although the Commissioner is free to accept or reject the testimony of any witness, a "finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible plenary review of the record."

<u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing <u>Carroll</u>, 705 F.2d at 643). Further, the ALJ's findings must be consistent with the other evidence in the case. <u>Id</u>. at 261.

The ALJ should consider the claimant's subjective complaints of symptoms only to the extent that they are consistent with the medical evidence, but should not reject those complaints simply because the objective medical evidence does not support them. <u>See</u> 20 C.F.R. § 416.929(a)(c)(2).

In considering ILW's symptoms, the ALJ followed a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the claimant's pain or other symptoms.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms had been shown, the ALJ then evaluated the intensity, persistence, and limiting effects of ILW's symptoms to determine the extent to which they limit ILW's ability to do basic activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical

evidence, the ALJ made a finding on the credibility of the statements based on the entire case record.  Id.

When determining whether a claimant is disabled, the ALJ considers evidence from (1) acceptable medical sources, and (2) other sources, which included non-acceptable medical sources. See 20 C.F.R. § 416.913.  Acceptable medical sources include licensed physicians and licensed or certified psychologists, see 20 C.F.R. § 416.913(a), whereas "other sources" include other types of medical sources as well as non-medical sources.  See 20 C.F.R. § 416.913(d)(1); SSR 06-03p.  Under the commissioner's regulations, only acceptable medical sources can be considered treating sources, see 20 C.F.R. § 416.902, and thus, sources whose opinions potentially are entitled to controlling weight, see 20 C.F.R. § 416.927(d)(2).

ILW saw three providers at Clifford Beers Clinic: Irja Peck, Douglas C. Nygren and Joan Kearney.  None of these providers are licensed physicians or licensed certified psychologists; they are "other sources" and as such their opinions are not entitled to controlling weight.  See 20 C.F.R. § 416.913(d)(1).  Nonetheless, the ALJ was obligated to consider their opinions as evidence to the extent that they provide insight into the extent of the claimant's impairments and limitations.  See 20 C.F.R. § 416.913(d)(1); SSR 06-03p.

The ALJ found Mr. Nygren's assessment to be inconsistent

with ILW's treatment records at Clifford Beers Clinic as well as
her school records.  (Tr. at 8).  Mr. Nygren's February 2008
report indicated that, even with some improvement as the result
of medication, ILW was extremely or at least markedly impaired in
every functional area.  ILW's records show that her lowest GAF
was 50 and the highest was 55.  ILW's school records indicate
that she does well academically despite some behavioral problems.
The ALJ also found Mr. Nygren's opinion inconsistent with the
plaintiff's testimony, which indicated that ILW is able to care
for herself with supervision and that plaintiff is not being
contacted as frequently as in the past about ILW's behavioral
problems at school.  The ALJ also questioned the credibility of
Mr. Nygren's opinion because, in the same report, he indicates
both that the claimant has no impairments in health and well-
being and that she is markedly impaired in this area.  (Tr. at
9).

     The ALJ did not credit Dr. Campagna's December 2006 opinion
because, while his report would indicate that ILW met the
requirements of Section 112.11, it also indicates that her
observed behavior was not typical of how she usually behaves.
Dr. Campagna said that she clung to her mother and was not
communicative.  Most of the record indicates that the claimant
easily separated from her mother and that, if there were any
problem with communication, it would be that she was overly

communicative, in that she had a tendency to interrupt when others are talking.  See Tr. at 341 ("ILW easily separated from her mother and engaged with the therapist.")  The ALJ also found Dr. Campagna's opinion that ILW had a 15 point IQ loss as a result of organic mental impairment inconsistent with the school records indicating that ILW has at least average academic ability except for problems with concentration.  In addition, both of the state agency medical and psychological consultants noted that Dr. Campana's opinion was inconsistent with the school records.

VIII.  Medical Expert Testimony

Plaintiff argues that the ALJ should have obtained the testimony of a medical expert on the issue of medical equivalence.  SSR 96-6p provides that an ALJ must receive into the record the judgment of a physician designated by the Commissioner on the issue of equivalence.  In most cases, the requirement is satisfied when there is a Disability Determination and Transmittal Form in the record signed by a state agency medical consultant.  Id.  The state agency medical consultant's signature on a Disability Determination and Transmittal Form ensures that the consultant has considered the question of medical equivalence at the initial and reconsideration levels of administrative review.  Id.

In this case, there are two Disability Determination and Transmittal Forms in the record, one from the initial level of

consideration and one from the reconsideration level. (Tr. 78-79). As stated above, the ALJ erred in developing the record because she does not assess or explain the weight given to these opinions.

The ALJ may be required to obtain an updated medical opinion on the issue of equivalence from a medical expert at the administrative hearing in two circumstances: (1) when, in the opinion of the ALJ, the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or (2) when additional medical evidence is received that, in the opinion of the ALJ, may change the state agency medical consultant's finding that the impairments are not equivalent in severity to any listed impairment. SSR 96-6p. While neither of the situations considered by SSR 96-6p is present in this case, the medical expert opinions that were received were not discussed in the ALJ's ruling.[5] Thus, although the requirement is satisfied when there is a Disability Determination and Transmittal Form in the record signed by a state agency medical consultant, because the ALJ failed to offer any explanation of the weight given to these opinions, the ALJ did not comply with SSR 96-6p. The ALJ should

---

[5] The opinions of State Agency physicians are considered to be expert opinions of non-examining medical sources. 20. C.F.R. § 416.927(f).

39

have either assessed and explained the weight accorded to the opinions of the State Agency physicians and psychiatrists or obtained an updated medical opinion.

IV.   Appeals Council Failed to Consider New Evidence

Plaintiff submitted new evidence to the Appeals Council and argues that the Appeals Council should have afforded controlling weight to the new evidence.  The new evidence was a letter written by ILW's therapist, Douglas Nygren, dated July 23, 2008, describing the reasons why Mr. Nygren believed that the ALJ erred in finding ILW not disabled as well as submitting treatment notes from Clifford Beers Clinic, dated July 2007 through July 2008.

The Appeals Council determined that Mr. Nygren's letter was repetitive of his February 2008 opinion to which the ALJ afforded little weight.  While Mr. Nygren did state that ILW had been referred to a day hospital for further treatment, the plaintiff did not submit any treatment notes from the day hospital.  Thus the "new evidence" was hardly new to the Appeals Council and was properly determined to be an insufficient basis for changing the ALJ's decision.

V.   Conclusion

The case is remanded for further development of the evidence, including securing complete updated medical records from ILW's treating doctors and status reports from treating therapists. See Rosa v. Callahan, 168 F.3d 72, 82-83 (2d Cir.

1999) (remand appropriate for further finding to help assure the proper disposition of the claim).  Accordingly, plaintiff's Motion for an Order Reversing the Decision of the Commissioner **[Doc. #13]** is **denied in part and granted in part** and defendant's Motion to Affirm the Decision of the Commissioner is **[Doc. #19]** is **DENIED.**

Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (104) days of the receipt of this order. Failure to object within fourteen (14) days may preclude appellate review. <u>See</u> 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 2 of the Local Rules for United States Magistrates; <u>Small v. Secretary of H.H.S.</u>, 892 F.2d 15 (2d Cir. 1989)(per curiam); <u>FDIC v. Hillcrest Assoc.</u>, 66 F.3d 566, 569 (2d Cir. 1995).


ENTERED at Bridgeport this 5th day of August 2010.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE